Fremont-Smith, J.
This matter is before the court on the motion of the defendants, all employees of the Massachusetts Department of Correction, to dismiss the Complaint of the plaintiff, Theodore Ray Clark, pursuant to Mass.R.Civ.P. 12(b)(6), on the grounds that it fails to state a claim upon which relief can be granted. In the alternative, the defendants move this Court to grant summary judgment in their favor as it is their contention that no genuine issue of material fact is present and that they are entitled to judgment as a matter of law. Mass.R.Civ.P. 56.
Since matters outside the pleadings were presented and were not excluded by this Court, Rule 12(b) requires that the motion to dismiss be treated instead as one for summary judgment. The Court will then consider, for purposes of this summary judgment motion, the facts set forth in the defendants’ affidavit[2] and facts contained in the record which were agreed to be undisputed at the hearing. In the underlying action, the plaintiff, pro se, asks for judicial review of the decision of a disciplinary proceeding held on January 25, 1993, at the Massachusetts Correctional Institution at Cedar Junction (“MCI-CJ”) where the plaintiff is lawfully confined.
In his Complaint alleging violations of federal and state constitutional protections as well as of the regulations of the Department of Correction, the plaintiff seeks declaratory, injunctive, and monetary relief, under 42 U.S.C. §1983. The plaintiffs Complaint can be broken into the following claims: use of excessive force on November 29, 1992 (Count I); improper placement in administrative segregation while the plaintiff was awaiting action on two disciplinary reports arising from the incidents of November 29 (Count II); denial of the plaintiffs right to call witnesses in his defense at the disciplinary hearing of January 25, 1993 (Count III); refusal to provide access to video tapes of the incidents described in the disciplinary reports (Count IV).
Claiming that the decision of the Special Hearing Officer imposing a sanction of 14 months in the Departmental Disciplinary Unit and 90 days loss of good-time credits was arbitrary and capricious and not based on substantial evidence,[3] the plaintiff requests that all charges against him be dismissed.
This action is in the nature of certiorari, pursuant to G.L.c. 249, §4. The defendants argue that such an action limits a reviewing court to the correction of “substantial errors of law on the record adversely affecting material rights.” Sullivan v. Committee on Rules of the House of Representatives, 331 Mass. 135, 139 (1954). The defendants further urge this Court to consider its task to be only that of determining whether the decision of the disciplinary officer or board is supported by substantial evidence. See discussion in Cepulonis v. Comm’r of Correction, 15 Mass.App.Ct. 292, 295 (1983). It is clear, however, that the reviewing court, in questioning the legaliiy of the decision, may also inquire as to whether the hearing was “unconstitutional as violating State and Federal due process guarantees." Wightman v. Superintendent, Massachusetts Correctional Institution, Walpole, 19 Mass.App.Ct. 442, 444 (1985).
BACKGROUND
The plaintiff, Theodore Ray Clark (“Clark”), is presently housed in the Departmental Disciplinary Unit at MCI-CJ.[4]
Since the start of his incarceration in 1989, he has received 54 disciplinary reports, 38 of which were for violations of Rule #8 (disrupting institutional security or the orderly running of the institution) and eight *196 were for violations of Rule #18 (assaulting another person). See 103 CMR 430.24(8) and 430.24(18). (Sherwin Report p.4.)
The incidents giving rise to the two disciplinary reports at issue here (Report No. 92-3840 and 92-3841) took place at MCI-CJ on Sunday, November 29, 1992, at approximately 3:00 in the afternoon, while the plaintiffs wife was visiting him.[5] The incidents arose from the response of the Department of Correction (“DOC") staff to what they considered inappropriate behavior on the part of the plaintiff.
It is the interpretation of that behavior that is in controversy here: whether the plaintiff “grabbed his wife’s shirt near the neck” or simply embraced her; whether the wife “ran away” from the picnic table where she and the plaintiff had been sitting or whether she simply stood up and moved away; whether the plaintiff “grabbed his wife by the arm, pulling her across the picnic table” or whether he simply touched her arm. The only person other than the plaintiffs wife, Tashiva Williams, to observe this behavior was the Correction Officer, Jeffrey Cardin (“Cardin”), who was assigned to the visiting area. No other visitors were in the outside area. The only officer present, Cardin, was standing too far from the plaintiff and his visitor to hear what was being said.
After observing the first of these presumed “assaults,” Cardin asked the plaintiff what he was doing. The plaintiff replied, “What it is, is a black thing.” (Cardin Report.) Cardin then notified Sergeant Melissa Flaherty that the plaintiff was acting inappropriately and informed the “Inner Control.”
The plaintiff and his wife were told to return to the visiting room lobby and to leave the outside area after Cardin observed what was thought to be two other “assaults." By that time, both Sergeant Flaherty and Lieutenant Bennett had arrived and learned of the “assaults” from Cardin. They asked the plaintiff or his wife or both to tell them what had happened. Although Lieutenant Bennett reported that the plaintiff responded by saying “nothing had happened, that it was my visit and none of your business” (Sherwin Report p. 2A), Tashiva Williams alleges that the plaintiff was cut off in the middle of explaining that he had merely been seeking consolation from his wife who had just told him of his mother’s death. (Williams Aff. Nov. 30, 1992.)
When informed that the visit was being prematurely terminated, the plaintiff responded aggressively, shouting and refusing to be handcuffed, and swinging his arms. Although the plaintiff did not actually make contact with Lieutenant Bennett, it appeared otherwise to Cardin who then activated his body alarm for assistance. The plaintiff was wrestled to the ground and handcuffed by at least two of the officers, soon joined by about ten others. (Williams Aff. Nov. 30, 1992.) At that point, Tashiva Williams was “pushed out the door.” (Williams Aff. January 25, 1993.)
The plaintiff, now in leg irons, was escorted by Lieutenant Riley to a holding cell and from there to the Health Services Division Treatment Room. (Use of Force Report.) The plaintiff complained of pain in his back and tingling of his fingers. No bruises or injuries were noted. (Progress Notes.)
On November 30, 1992, with the approval of the shift commander, the plaintiff was placed in the upper tier of the West Wing Segregation Unit, used for inmates on “awaiting action” status. During this period the plaintiff was kept locked up 23 hours a day and was in full restraints when outside of his cell. (Plaintiff Mem. p. 4 and Complaint.) He was not allowed the same visiting privileges as the general prison population. The plaintiff remained in that unit for several months. Whether the plaintiff received his statutory fifteen-day reviews is a disputed issue of fact.[6]
On January 25, 1993, the disciplinary hearing was held before a Special Hearing Officer because of the gravity of the charge and the possible severity of the punishment. The two disciplinary reports were consolidated by the Hearing Officer at the start of the hearing.
The plaintiff was served with a copy of the decision, on February 3, 1993. He had been found guilty of violating Rule #1 (disobeying an order, lying to, or insolence toward a staff member), under 103 CMR 430.24(1), as well as Rule #8 and Rule #18. The decision was affirmed after administrative appeal.
Two months later, in April 1993, when an opening was first available, the plaintiff was placed in the Departmental Disciplinary Unit (“DDU”).
DISCUSSION
The defendants move this court to grant summary judgment in their favor on all counts of the plaintiffs Complaint. Mass.R.Civ.P. 56.
The Supreme Judicial Court has recently shed new light on the burden that Mass.R.Civ.P. 56 places on the moving and non-moving parties. The party moving for summary judgment has the burden “to show by credible evidence from (its) affidavits and other supporting materials that there is no genuine issue of material fact and that (it is) entitled, as a matter of law, to a judgment.” Smith v. Massimiano, 414 Mass. 81, 85 (1993), citations omitted. The opposing party “may not simply rest on his pleadings or general denials, he must ‘set forth specific facts' [emphasis added by the court) showing that there is a genuine, triable issue.” Id. at 86, quoting Rule 56(e).
If the moving party fails to establish the absence of a genuine issue of material fact, his motion must be denied. Massimiano, at 86, citing Community Nat’l Bank v. Dawes, 369 Mass. 550, 554 (1976).
“[A] party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates by reference to material described in Mass.R.Civ.P. 56(c), unmet by countervailing materi *197 als, that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case. To be successful, a moving party need not submit affirmative evidence to negate one or more elements of the other party’s claim [emphasis added].” Massimiano at 86, quoting Kourowacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
At issue in the instant case is whether the use of force, administrative segregation, and the procedures followed in the disciplinary hearing, violate DOC regulations or the due process guarantees under the 14th Amendment to the U.S. Constitution or those of Article 12 of the Massachusetts Declaration of Rights.
Count I: Excessive Force
DOC policy governing the use of force by its employees is set forth in a series of regulations. 103 CMR 505.00 et seq. According to those regulations, an employee may use reasonable force in an enumerated set of circumstances, among which are the need to “move an inmate who has refused a proper order by an employee”; and the need to “preserve the safety of any employee, inmate, or visitor.” 505.07(f) and (j). The regulations indicate that a warning should be issued, if time permits, before force is used. A medical examination must take place as soon as possible afterward. 505.07(2) and 505.07(3). The use of excessive force is prohibited as is the use of force as punishment and discipline.
The regulations further provide that the use of instruments of restraint are to be used only “when all other reasonable methods of control have been considered and deemed inappropriate . . .” 505.10(5). If such instruments are not being used to prevent escape or during the routine movement of inmates from one point to another, then the use shall cease when the restrained inmate has exhibited, through acts or statements, that he will not resume the offending behavior. 505.10(7). Restraints are to be applied in such away as to use “the least amount of physical restraint necessary for the situation.” 505.10(11).
After the use of force by an employee of the DOC, the Superintendent or his designee, or the Special Unit Director or his designee, shall be notified immediately. 505.13(1). A written report shall be submitted as soon as possible. Failure to follow these regulations will subject the employee to “disciplinary action up to and including termination.” 505.15.
The Complaint alleges that the defendants used “excessive force sadistically for the very purpose of inflicting harm and pain.”
At issue is whether the force applied to the plaintiff by the ten or twelve DOC employees was “excessive” in the circumstances of November 29, 1992.
“In addressing an excessive force claim brought under §1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force.” Graham v. Connor, 490 U.S. 386, 394(1989).
In the instant case, the source of constitutional protection against physically abusive governmental conduct is the Eighth Amendment’s ban on cruel and unusual punishments. Id.
“Not every push or shove, even if it may later seem unnecessary in the peace of a judge’s chambers, violates a prisoner’s constitutional rights.” Schiller v. Strangis, 540 F.Supp. 605, 615 (D.Mass. 1982). “In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.” Id., citing Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973).
The key phrase used to define violations of the Eighth Amendment is the “unnecessary and wanton infliction of pain.” Whitley v. Albers, 475 U.S. 312, 319 (1986).
While it might be debatable whether ten or twelve officers were necessary to subdue one inmate, it is not unreasonable to have used force to pin down the plaintiff while handcuffs were being applied. Given the plaintiffs history of disciplinary charges, his presumed “assaults” on his visitor, and his aggressive language and stance when Flaherty and Bennett indicated that the November 29 visit was being terminated, it was objectively reasonable to use some force on this inmate. The fact that no injuries or bruises were noted by medical personnel when the plaintiff was subsequently examined strengthens the argument of the defendants that the force used was necessary and not excessive.
This Court finds that the defendants are entitled to judgment on the plaintiffs claim under Count I.
Count II: Abuse of discretion in use of administrative segregation.
The plaintiff argues that his placement in the West Wing Segregation Unit while awaiting first, the disciplinary hearing and then, an available opening, violates DOC regulations.
The plaintiff contends that there was no official authorization for that placement and that the conditions of confinement represent a sanction imposed before a verdict had issued. Since the plaintiff is no longer in administrative segregation but is actually serving his sentence in the DDU, he requests that the time spent in the Segregation Unit while on “awaiting action status” be counted towards his 14-month sentence in the DDU.
The Department of Correction regulation covering such administrative segregation, 103 CMR 430.21, indicates, unambiguously, that the Superintendent or his designee has the authority to place the plaintiff in such a unit both before the hearing and after.
(1) At the discretion of the Superintendent or his designee, and subject to any applicable review requirements, an inmate who is under investigation for *198 a possible disciplinary offense or has been charged with or found guilty of a disciplinary offense, may be placed on awaiting action status at the institution where he is then confined. Such status may include more restrictive confinement as deemed appropriate by the Superintendent or his designee.
In considering whether that exercise of discretion was sound, this Court may be guided by the following principles. The United States Supreme Court has stated repeatedly that prison officials should be accorded “wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.” Bell v. Wolfish, 441 U.S. 520, 547 (1979). Also, the Supreme Court has held that “administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration” and that such segregation does not involve an interest independently protected by the due process clause. Hewitt v. Helms, 459 U.S. 460, 468 (1983).
Consequently, summary judgment on the plaintiffs claim regarding the impropriety of his placement in the West Wing Segregation Unit is granted to the defendants.
Count III: Denial of the right to call a witness.
Even in the scaled-down due process minima that the United States Supreme Court has deemed appropriate to those disciplinary hearings where a prisoner’s liberty interest is at stake, the right to call witnesses and to present documentary evidence cannot be denied without providing a justification. Ponte v. Real, 471 U.S. 491, 492 (1985).
While the United States Supreme Court will consider that the requirements of the Fourteenth Amendment are satisfied if the reasons for denial are stated by the prison officials “at some point,” those reasons need not be in writing, nor included in the administrative record, nor contemporaneously stated.[7] It is sufficient for constitutional purposes that the prison officials explain their decision “later.” If the reasons for a denial do not appear in the record and were not stated orally during the hearing, those reasons may be indicated in the context of a prisoner’s request for judicial review of the disciplinary proceeding. Id. at 497.
In the instant case, the DOC officials denied the plaintiffs request for one of his three witnesses. While the Special Hearing Officer allowed the two other witnesses requested, Cardin and Lieutenant Bennett, to appear at the hearing, the request to have Tashiva Williams-Clark appear was denied. The Statement of Evidence Relied Upon at the disciplinary hearing invites the hearing officer to “indicate the reason(s) for denial" of an inmate’s requested witness. Citing 103 CMR 430.14 (4C), Sherwin wrote that “(b)y precedent, non D.O.C. personnel (staff and inmates) are not allowed to appear before Disciplinary Hearings.” (Sherwin Report p.3.)
The relevant regulation cited by Sherwin refers to denial of a witness because of “hazards presented by an individual case.” Since those hazards are not specifically described, and since the reference to a blanket departmental policy, nowhere indicated in the regulations, is an insufficient explanation of the denial, this Court finds that the DOC has not met its burden under Ponte. That burden is only met when the reasons for the denial are “logically related to preventing undue hazards to ‘institutional safety or correctional goals.’ ” Ponte, supra at 497, quoting Wolff v. McDonnell, 418 U.S. 539 (1974).
The United States Supreme Court, in granting broad discretion to the prison officials in this and other matters related to the procedures used at disciplinary hearings, nonetheless warned those officials that “across-the-board” policies denying witness requests will not invariably pass constitutional muster. Ponte, supra at 496. Massachusetts has similarly rejected mere “rote recitation of shorthand phrases” used as explanations of such denials. Nelson v. Comm’r of Correction, 390 Mass. 379, 393 (1983), citing Finney v. Mabry, 455 F.Supp. 756, 776 (D.Ark. 1978). Nor will an explanation of the denial decision at the hearing necessarily “immunize prison officials from a subsequent court challenge to their decision.” Ponte, supra at 497.
Almost all reviewing courts are receptive to arguments as to the risk of reprisal or institutional havoc when inmates are called as witnesses and particularly when the witness requested is the informant. There is little discussion in the case law, however, of the policy justifications underlying denial of anon-inmate witness such as the plaintiffs wife. In fact, it is difficult to imagine the risks to institutional security in having Tashiva Williams-Clark testify in her husband’s behalf since she had willingly appeared at the prison on the day of the hearing, since the hearing itself could be held near the visiting area, and since her presence posed no danger to either an inmate or an employee of the DOC.
The competing considerations are overwhelming. Tashiva Williams-Clark could turn out to be the crucial witness in this matter. Since the Special Hearing Officer decided to accept her affidavits (which denied any assault) but then rejected her arguments without explanation, the entire hearing was constitutionally flawed.[8] Without the live testimony of the plaintiffs wife, the hearing officer had little choice but to rubber stamp the disciplinary report, a procedure expressly rejected in Nelson, supra at 393.
The defendants’ motion for summary judgment is denied as to this claim, subject to reconsideration at such time as the defendants shall present to the Court, within twenty-one days, sworn testimony specifying the reasons, if any, that the testimony of the wife of the plaintiff would have caused “undue hazards to institutional safety or correctional goals.” Ponte, supra at 497. If no such reasons exist, the defendants will be required to afford the plaintiff a new hearing before a different hearing officer.
*199 Count IV: Denial of access to video tapes of incident.
The plaintiff claims that his ability to mount a meaningful defense has also been impaired by the DOC’s refusal to provide access to video tapes of the November 29, 1992 incidents.
In response, the DOC alleges that there were no videotapes of that incident. (Def. Mem. p. 11.) The Special Hearing Officer informed the plaintiff that “a Sergeant told him that there is no camera in the lobby area.” The plaintiff, however, insists, without providing further explanation, that there was a camera present.[9]
According to DOC regulations, the hearing officer “may consider written, oral and physical evidence,” 103 CMR 430.14(2), and the inmate shall be allowed to present “other evidence, when permitting him to do so will not be unduly hazardous to personal safety, institutional safety or correctional goals.” 430.14(4). If videotapes of the incident do exist, it seems patently unfair to have refused observation of such videotapes at the hearing.
Accordingly, the defendants are directed to provide the Court, within twenty-one (21) days, with sworn testimony as to the tapes’ non-existence, or, if they do exist, sworn testimony as to the reasons that a presentation of tapes would be unduly hazardous to personal safety, institutional safety or correctional goals; or shall provide the plaintiff, within thirty (30) days, with a new administrative hearing to be conducted before a different officer, at which time the tapes shall be observed and made part of the record.
ORDER
For the foregoing reasons, it is hereby ORDERED that the motion for summary judgment in favor of the defendant employees of the Massachusetts Department of Correction is ALLOWED as to Count I and Count II of the Complaint and DENIED as to Count III and Count IV.
It is hereby further ORDERED that the defendants are to provide the Court and the plaintiff within twenty-one (21) days, with sworn testimony (by affidavit or by court testimony) with respect to the reasons for having prohibited the plaintiffs wife from testifying at the hearing and with respect to the videotapes, as described above. If such testimony is not provided within twenty-one (21) days, defendants shall afford plaintiff, within thirty (30) days, a new administrative hearing before a different hearing officer, which shall be conducted in accordance with this Memorandum of Decision.

 Although the plaintiff was informed at the September 1, 1993 hearing before this Court that he could submit further memoranda and affidavits in the ten following days, he added nothing to the file.

 burden of proof at the hearing is on the “proponent” of a disciplinary report and the decision is based on a preponderance of the evidence. Evidence that is to be accorded probative value is that which “reasonable persons are accustomed to rely on in the conduct of serious affairs (§430.13.(3)).” This standard is equivalent to the “substantial evidence" standard set out in the State Administrative Procedure Act G.L.c. 30A §11(2). Wightman v. Superintendent, Massachusetts Correctional Institution, Walpole, 19 Mass.App.Ct. 442, 445 (1985).

 Clark’s governing sentence is for 18 to 25 years for armed assault with three additional concurrent sentences. Those sentences were reduced through appeal. (Plaintiff. Mem. p. 5.)

 Tashiva Williams-Clark’s affidavit refers to the presence of her sister in the visiting area but no other reference to the sister appears in the record before the Court.

 The defendants contend that the plaintiff received weekly administrative reviews while on AA status and that copies of those reviews are available to the court on request. (Mc-Crosson Aff.)

 In Ponte v. Real the United States Supreme Court disagreed with the Massachusetts Supreme Judicial Court regarding the requirement of a written contemporaneous statement to be included in the administrative record of the hearing. See Real v. Superintendent, Massachusetts Correctional Institution, Walpole, 390 Mass. 399, 406-07 (1983), vacated, Ponte v. Real 471 U.S. 491 (1985). On remand, the SJC reversed the judgments of the trial court when the defendant Superintendent could not demonstrate the reasons for denial of the inmate’s request to call witnesses. Real v. Superintendent, Massachusetts Correctional Institution, Walpole, 396 Mass. 1001, 1001 (1985).

 “Time has proved .. . that blind deference to correctional officials does no real service to them. Judicial concern with procedural regularity has a direct bearing upon the maintenance of institutional order; the orderly care with which decisions are made by the prison authority is intimately related to the level of respect with which prisoners regard that authority. There is nothing more corrosive to the fabric of a public institution such as a prison than a feeling among those whom it contains that they are being treated unfairly." Palmigiano v. Baxter, 487 F.2d 1280, 1283 (1st Cir. 1973).

 Plaintiff has merely indicated, on a separate sheet, that there is a camera in the lobby “if you listen to the tapes that Mr. Sherwin recorded.”