George **WILSON** et al., Plaintiffs,

v.

Abraham **BEAME**, Individually and as Mayor of the City of New York, et al., Defendants.

No. 74 C 208.

United States District Court, E. D. New York.

June 7, 1974.

John C. Gray, Jr., Paul M. Gulielmetti, Brooklyn Legal Services Corp., Brooklyn, N. Y., William E. Hellerstein, Daniel Pochoda, Legal Aid Society, Prisoners' Rights Project, New York City, of counsel, for plaintiffs.

Adrian P. Burke, Corp. Counsel, New York City, Donald J. Tobias, Rosemary Carroll, New York City, of counsel, for defendants.

## MEMORANDUM OF DECISION AND ORDER

WEINSTEIN, District Judge.

Plaintiffs, nine present and former pretrial detainees at the Brooklyn House of Detention for Men (hereinafter "BHD"), seek a preliminary injunction in this civil rights action. 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3). They challenge (1) lack of due process in assigning them to "administrative segregation" and (2) different treatment from that accorded other inmates.

Extensive evidentiary hearings were held in the courthouse and at the BHD. The court inspected the BHD and observed its various programs.

For the reasons stated below, a preliminary injunction must be granted requiring that plaintiffs not be denied opportunities to attend religious services, consult with jailhouse lawyers and participate in educational programs available to other inmates. The issue of the alleged lack of due process in assigning plaintiffs to administrative segregation is moot.

### I. MOOTNESS OF DUE PROCESS ISSUE

Officers of the BHD testified that they observed plaintiffs Paul Coppolla, Gregory Wise and Pedro Monges attempting to escape; they have since been indicted for this alleged crime. Thus good ground exists for believing them to be dangerous to the institution. The grand jury indictments and the right to prompt trials on the pending escape charges furnish adequate protection against unreasonable administrative segregation.

Three other plaintiffs, George Wilson, Timothy Adams and George Jackson, have been released on their own recognizance or on low bail. John Beuther and Joseph Torres have been transferred to other institutions where they are serving prison terms. The complaint is moot as to these parties.

There is substantial documentary evidence that the final plaintiff,

Samuel Williams, attempted to escape. He allegedly communicated to outside confederates detailed plans for attacking a vehicle of the Corrections Department while it was transporting him from the BHD to court. If he is indicted or tried administratively within thirty days from this order for this alleged attempt his rights will be adequately protected. If he remains in administrative segregation beyond that period without having been indicted or tried he may renew his application for preliminary relief.

The Court's decision with regard to plaintiff Williams is based on the fact that even when the conditions of administrative segregation have been equalized to the extent possible, the issue to which we will shortly turn, administrative segregation, considered in its totality, still constitutes a more significant abridgement of personal liberty than confinement with the general population. To curtail freedom of association is the very purpose of plaintiffs' segregation. See N.Y. Dep't Corr. Gen. Order No. 33, § 4.48A. Moreover, inmates in segregation are "under closer observation than individuals in the general inmate population" (ibid) and consequently enjoy less personal privacy.

Reducing freedom of association and personal privacy is onerous.

"In a prison setting where liberty is by necessity shrunken to a small set of minor amenities . . . it is likely that any marked change of status which forecloses such liberties will be perceived and felt as a grievous loss . . . . This implies that a minimal level of due process must be achieved in reaching any decision concerning a particular inmate which may result in a marked change in the status of the inmate's confinement, with the result that he may be deprived of amenities on which he has come to rely. The stakes are simply too high for the inmate . . . . This is as true for a decision based on the security requirements of the institution . . . as it is for one based on

a disciplinary violation." Palmigiano v. Baxter, 487 F.2d 1280, 1284–1285 (1st Cir. 1973).

*Cf.* Morrissey v. Brewer, 408 U.S. 471, 482, 92 S.Ct. 2593, 2601, 33 L.Ed.2d 484, 495 (1972) ("It is hardly useful any longer to try to deal with this problem in terms of whether the parolee's liberty is a 'right' or a 'privilege.' By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment.").

Pending disposition of escape charges the warden is justified in using administrative segregation to protect the security of the institution pursuant to General Order Number 33 of the Department of Corrections of the City of New York, reading in part as follows (Dec. 14, 1972):

"4.48A Administrative Segregation is a classification within a facility of the Department the purpose of which is to keep an individual or individuals segregated from and under closer observation than individuals in the general inmate population at large.

4.48B The following are reasons why an individual may be kept in an Administrative Segregation status:

\* \* \*

d. Escape Risk

\* \* \*

h. Cases awaiting the action of the Disciplinary officer or the Disciplinary Board

i. Cases that present a threat to the good order, discipline or security of the facility."

We cannot ignore the fact, of which we take judicial notice, that there have been a number of recent escape attempts from the BHD, some of them successful.

Administrative segregation is common in American jails to protect both inmates and personnel. For example, the United States Bureau of Prisons Statement on Inmate Discipline provides in part (7400.5B, 6–6–72):

"6. SEGREGATION

a. Segregation, or the isolating of one inmate from the general population, is a technique used for a variety of purposes. It is a method of protecting potential victims, insuring witnesses against intimidation, supporting those who lack strength enough to live in the prison community, controlling those whose violent emotions are out of control, restricting communication when necessary, and other specified and recorded reasons for the control and management of behavior."

Under the circumstances of this case it is unnecessary to decide the precise form of due process required before non-punitive administrative segregation under Order 33 may be utilized when prisoners are not indicted or tried departmentally. *See, e. g.*. Arnett v. Kennedy, 316 U.S. 134, 153, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); Morrissey v. Brewer, 408 U.S. 471, 486, 92 S.Ct. 2593, 2603, 33 L.Ed.2d 484, 497 (1972) ("This independent officer need not be a judicial officer . . . . It will be sufficient . . . if an evaluation of whether reasonable cause exists . . . is made by someone . . . other than the one who has made the report of parole violations or has recommended revocation. A State could certainly choose some other independent decisionmaker to perform this preliminary function."); Wilkinson v. Skinner, 34 N.Y.2d 53, 356 N.Y.S.2d 15, 312 N.E.2d 158 (1974); Rhem v. Malcolm, 371 F.Supp. 594, 632 (S.D.N.Y. 1974) ("While the formulas vary, the majority of decisions considering the subject have required hearing by an impartial tribunal, at least to the extent of prohibiting a single supervisor from acting both as investigating and hearing officer.").

Were plaintiffs threatened with *punitive* segregation, with its attendant stigma and loss of rights and privileges, imposition of punishment might require fuller procedural protection. *See* Palmigiano v. Baxter, 487 F.2d 1280 (1st Cir. 1973); McDonnell v. Wolff, 483 F.2d 1059 (8th Cir. 1973), cert. granted, 414 U.S. 1156, 94 S.Ct. 913, 39 L.Ed.2d 108 (1974); United States ex rel. Miller v. Twomey, 479 F.2d 701 (7th Cir. 1973), cert. denied sub nom., Gutierrez v. Dept. of Public Safety, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974); Rhem v. Malcolm, 371 F.Supp. 594, 632 (S.D.N.Y. 1974) and the cases there cited; *see generally* M. Millemann, Due Process Behind the Walls, in M. Hermann and M. Haft, eds., Prisoners' Rights Sourcebook 79–109 (1973).

There is every reason to expect that in being segregated plaintiffs' rights to due process will not be violated. Should this assumption prove unwarranted "federal courts will discharge their duty to protect constitutional rights" of these prisoners. Procunier v. Martinez, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224, 236 (1974) (mail and right to paraprofessional help); Newkirk v. Butler, 499 F.2d 1214 (2d Cir. 1974); Clutchette v. Procunier, 497 F.2d 809 (9th Cir. 1974); Palmigiano v. Baxter, 487 F.2d 1280 (1st Cir. 1973) (punitive segregation without due process); Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971), cert. denied sub nom., Sostre v. Oswald, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972) (punitive segregation without due process; mail; denial of paraprofessional help; free speech). There is no place in this country for any form of Gulag Archipelago.

## II. DIFFERENTIAL TREATMENT

■ Plaintiffs in this action are not convicted prisoners. The state's right to interfere with the personal liberty of pretrial detainees is much more limited than its interest in dealing with convicted prisoners. The concept of the least restrictive form of incarceration consonant with the accused's being available for trial is inherent in jail prior to trial. It is a constitutional corollary of the constitutional right to bail. In the words of Blackstone:

"Upon the whole, if the offense be not bailable, or the party cannot find bail,

he is to be committed to the county gaol . . . there to abide till delivery by due course of law. . . . But this imprisonment, as has been said, is only for safe custody, and not for punishment: Therefore, in this dubious interval between the commitment and trial, a prisoner ought to be used with the utmost humanity, and neither be loaded with needless fetters, or subjected to other hardships than such as are absolutely requisite for the purpose of confinement only." 4 Blackstone Commentaries 300.

*See, e. g.,* Rhem v. Malcolm, 371 F.Supp. 594, 623 (S.D.N.Y.1974) ("a detainee may not be deprived of the rights of other citizens beyond the extent necessary to assure his appearance at trial and the security of the institution to which he is confined"); United States ex rel. Manicone v. Corso, 365 F.Supp. 576, 577 (E.D.N.Y.1973), protections after conviction apply *a fortiori* before conviction); Inmates of Milwaukee County Jail v. Petersen, 353 F.Supp. 1157, 1160 (E.D.Wis.1973) ("as individuals who have not been convicted of crime, they retain all rights retained by arrestees who have been released on bail, except for the curtailment of mobility deemed necessary to secure attendance at trial and the limitations necessary to protect the security of the institution in which they are detained."); Collins v. Schoonfield, 344 F.Supp. 257, 265 (D.Md.1972) (a pretrial detainee "can only be deprived of the constitutional rights a defendant on bail awaiting trial enjoys to the extent such denial is required to insure that he appears at trial and to restrain him from endangering or disrupting the security of the institution in which he is detained"); Brenneman v. Madigan, 343 F.Supp. 128, 138 (N.D.Cal.1972) ("the principle of the least restrictive alternative consistent with the purposes of a commitment inheres in the very nature of [a] pre-trial confinement which entails an extraordinary deprivation of liberty justifiable only when the detainee is unable to make bail"); Seale v. Manson, 326 F.Supp. 1375, 1379 (D.Conn.

1971) ("Unconvicted detainees may be treated as convicts only to the extent the security, internal order, health, and discipline of the prison demand; considerations of rehabilitation, deterrence, or punishment are not material."); S. A. Bass, Improving Conditions In Pretrial Detention Facilities, in M. Hermann and M. Haft, eds., Prisoners' Rights Sourcebook, 126–29 (1973).

█ Because the state's interest in interfering with the personal liberty of pretrial detainees is limited, the courts must undertake an exacting scrutiny of their constitutional claims. The more deferential judicial attitude, *arguendo* appropriate where the state may legitimately pursue rehabilitation, deterrence, or punishment, would be misplaced here. *See, e. g.,* Howard v. Smyth, 365 F.2d 428, 431 (4th Cir.), cert. denied, 385 U.S. 988, 87 S.Ct. 599, 17 L.Ed.2d 449 (1966) (prisoners confined to maximum security ward where institutional privileges severely restricted for seeking Muslim religious services being "arbitrarily punished"); Allen v. Nelson, 354 F.Supp. 505 (N.D.Cal.), aff'd., 484 F.2d 960 (9th Cir. 1973) (charges based on killing of correction officer had been dismissed; substantial deprivation of benefits available to other prisoners); United States ex rel. Walker v. Mancusi, 338 F.Supp. 311 (W.D.N.Y.1971), aff'd., 467 F.2d 51 (2d Cir. 1972) (prisoners believed to be active participants in prison riot; severe deprivation of conditions available to general prison population); Urbano v. McCorkle, 334 F.Supp. 161, 168 (D.N.J.1971), aff'd., 481 F.2d 1400 (3rd Cir. 1973) ("prisoners who are confined to administrative segregation for the good of the institution [because of threat of riot] should be entitled to the same minimal due process that is already afforded prisoners who are confined to segregation for disciplinary infractions."); Smoake v. Fritz, 320 F.Supp. 609 (S.D.N.Y.1970) (solitary confinement based on suspicion of participating in earlier riots).

The need to equalize the conditions of those administratively segregated is rec-

ognized by the Department of Corrections itself, for Order 33 mandates that equality. It provides in part:

> "4.48C An individual in an Administrative Segregation status shall not be deprived of any right guaranteed by law, nor shall he be deprived of any privilege enjoyed by the general inmate population at large, except that the head of the institution may, in his discretion, permit these privileges at a different time and at a different place than is permitted to the general inmate population."

Plaintiffs are not substantially deprived of the rights and privileges—with a few important exceptions—enjoyed by the general inmate population. Specifically, despite their allegations to the contrary, plaintiffs suffer no appreciable deprivation with regard to consultation with counsel, use of law and other library books, visitation rights, availability of cleaning materials, medical attention, and use of mail, recreation, work and commissary facilities. Their quarters and the tier to which they have general access are at least as commodious as those of any other inmate. This finding is made with full recognition "that, in a prison context, withdrawal of privileges or the imposition of more burdensome conditions of confinement may constitute a grievous loss." Diamond v. Thompson, 364 F.Supp. 659, 664 (M.D. Ala.1973). *See also* Palmigiano v. Baxter, 487 F.2d 1280 (1st Cir. 1973).

There are, however, three areas in which those in segregated detention are deprived. They are access to religious services, jailhouse legal assistance and educational and arts and crafts programs.

A. *Access to religious services.* While confined to administrative segregation, plaintiffs are not permitted to participate with the general inmate population in religious services, nor are they permitted to observe, communally, religious holidays. If, as plaintiffs contend, organized religion is fundamentally communal in nature, to deprive a prisoner of the opportunity to worship with other members of his faith is to abridge an essential aspect of his right to the free exercise of his religion.

■ The Supreme Court is especially solicitous of claims under the Free Exercise Clause. *See, e. g.,* Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (refusal to accept employment on Saturday because of religious beliefs no basis for denying unemployment compensation). Here, the equal protection clause buttresses the claim. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (differential treatment burdening the exercise of a fundamental right constitutionally impermissible absent a compelling governmental interest). A regulation must either represent "no infringement by the State of . . . constitutional rights of free exercise, or . . . be justified by a 'compelling state interest in the regulation of a subject within the State's constitutional power to regulate . . . .'" Sherbert v. Verner, 374 U.S. at 403, 83 S.Ct. at 1793, 10 L. Ed.2d at 970.

■ Although the state's interest in maintaining the security of its houses of detention is "compelling," the state can, and therefore must, satisfy this interest by "less drastic" means than the total curtailment of plaintiffs' right to participate with non-segregated inmates in religious observances. *See* United States v. Robel, 389 U.S. 258, 268, 88 S.Ct. 419, 426, 19 L.Ed.2d 508, 516 (1967) ("statute which imposes a substantial burden on protected First Amendment activities, . . . must achieve its goals by means which have a 'less drastic' impact on the continued vitality of First Amendment freedoms."); Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed. 2d 231, 237 (1960) ("even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved."); Note,

Less Drastic Means and the First Amendment, 78 Yale L.J. 464 (1969).

Significant is the fact that the Chapel —located on the 11th floor—is so situated that the correctional authorities do not consider it an escape risk area. In this case the less drastic means is the provision of more correctional personnel to guard at religious services. *See* Collins v. Schoonfield, 344 F.Supp. 257, 283 (D.Md.1972) ("all restrictions upon attendance by any inmate of the religious services he wishes to participate in [should be reexamined]"); Konigsberg v. Ciccone, 285 F.Supp. 585, 595–596 (W. D.Mo.1968), cert. denied, 397 U.S. 963, 90 S.Ct. 996, 25 L.Ed.2d 255 (1970).

Some form of communal worship seems a hallmark of organized religion. From the time of near naked cave-dwellers propitiating animist gods to the era of the sophisticated modern westerner humbled before the abyss of infinite nature, people have gathered together to lend each other support in religious observances. Sociologists tell us that religion implies community. *See, e. g.,* E. Durkheim, The Elementary Forms of The Religious Life, 42–47 (1915; J. W. Swain trans. 1954); M. Weber, The Sociology of Religion, 60–79 (1922; E. Fischoff trans. 1963); J. M. Yinger, Religion, Society, and the Individual, 12–13 (1957).

The three major western faiths, Judaism, Christianity, and Islam—whose adherents constitute almost all the faithful at the BHD—encourage joint worship. All three recognize the critical event when God required Moses to call together the Israelite community *in a body* to receive the Law. *(e. g.,* Exodus 24:3, 35:1) and the Bible is replete with references to community prayer.

It is a principle of Talmudic Law that it is preferable to pray communally rather than alone. Important and mandatory prayers may be made only in the context of a *minyan,* a congregation of at least ten male adults. For example, *Kaddish,* the prayer for the dead, requires a *minyan.* Maimonides in his *Mishnah Torah,* Laws of Prayer (M. Hyamson trans. 1949), points out in part:

"CHAPTER VIII.

1. Congregational prayer is always heard [by the Almighty]. Even if there are sinners among them, the Holy One, blessed be He, does not reject the prayer of a multitude. Hence, a person should associate himself with the congregation, and never recite his prayers in private when he is able to pray with the congregation. One should always attend Synagogue, morning and evening; for only if recited in a synagogue, are one's prayers heard at all times. Whoever has a synagogue in his town and does not worship there is called a bad neighbour

\* \* \*

6. Every procedure of a sacred character should only take place in a congregation of Israelites, as it is said: 'And I will be sanctified in the midst of the children of Israel' (Leviticus 22:32)."

*See also* The Babylonian Talmud, I Seder Zera'im 23–28, 38–42, 288–89, Berakoth (Benedictions) at 6a, 6b, 8a, 47b (M. Simon trans. 1948, Soncino ed.); S. R. Hirsch, 2 Horeb, A Philosophy of Jewish Laws and Observances, 505–07 (Grunfeld trans. 1962); H. Seidman, The Glory of Jewish Holidays, 41 (1968) ("basic to the Jewish approach to prayer is that congregational worship supersedes individual devotion. It is the *duty* of the individual to pray with a congregation even when his prayer is one of personal nature. . . . no individual may keep aloof from his community and from its joys and sorrows.").

More recently, Martin Buber, a major Jewish theologian of this century, noted that religious revelation was not an intellectual grasp of some abstract ideal, but the result of a continuing encounter with others. According to Buber, one's response to others is the major religious responsibility, the concrete situation where a person risks greater or lesser self-realization and corresponding con-

tact with the divine center of life. To encounter the other is to encounter God's presence. Life apart from others is apart from God and without meaning. *See* M. Buber, I and Thou, *e. g.*, 54, 78–79, 101–103, 123–124 (R. G. Smith trans. 1958).

Christians focus on the life and teachings of Jesus. *See* R. Bultman, Jesus and The Word, 181 (L. P. Smith and E. H. Lantero trans. 1958) (oldest text of Lord's prayer, using phrase *"Our* Father in heaven, . . . *Our* daily bread give *us* today.") (emphasis added). To understand Jesus' teachings concerning the role of the religious community, it is instructive to examine aspects of the way He chose to live. Biblical historians suggest that at the time of his ministry Jesus was one of a number of preachers wandering through Israel; John the Baptist was another. *See,* R. Bultman, *supra,* 22, 25. The New Testament Gospel of Mark describes John as wearing "a garment of camel-skin," living on "locusts and wild honey," and wandering in the desert "wilderness" (Mark 1:3, 6); his life was apart from the community, although he made occasional forays into it. Similarly, some of the leading religious sects, including the Essenes, authors of the Dead Sea Scrolls, removed themselves from the life of the community of Israel for an isolated, monkish life by the Dead Sea waiting for the Last Judgment. *See* O. Betz, What Do We Know About Jesus? 28–30 (1965; M. Kohl trans. 1968). In contrast, the New Testament teaches that Jesus spent his ministry in the cities and towns of Galilee and Israel, at the center of the community, ministering among the poor, the sick, and the downtrodden. He gathered around him disciples who, in turn, spread his teachings through the land.

Thus Jesus acted at the center of the social community of Israel; when He preached His message that the Kingdom of God is at hand He was attempting to realize it within the community where He labored. *See* C. H. Dodd, The Parables of the Kingdom, 29–35, 160 (1961). Christian theologians hold that when Jesus gathered disciples, He was founding the model for the Christian Church— a community of coreligionists to minister within the broader social community in seeking to realize the message of God. *See* E. Schweizer, The Church as the Body of Christ, 76–78 (1964). The model of Jesus' life underscores His message that the Kingdom of God is to be sought and found among others, within the community.

Theologian Paul Tillich speaks of the basic state of the human condition as one of estrangement. P. Tillich, The Shaking of the Foundations, 159 (1948). For the Christian the path back from estrangement is participation in the religious community and, through that community, participation in the life of the world. *Id.* at 162–163. In an early work, theologian Dietrich Bonhoeffer, later martyred by the Nazis, wrote that,

> "The Christian comes into being and exists only in Christ's Church. He is dependent upon it, that is, upon the other man. Each man sustains the other in active love, intercession and forgiveness of sins through complete vicarious action, which is possible only in the church of Christ, resting as it does in its entirety upon the principle of vicarious action, that is, upon the love of God. But all are sustained by the church, which consists in this action for one another of its members. The church and its members are structurally together, and act vicariously for each other, in the strength of the church . . . of community based on love." D. Bonhoeffer, The Communion of Saints, 136 (1960; R. G. Smith trans. 1963).

*See* also D. Bonhoeffer, Life Together, 19 (J. W. Doberstein trans. 1954) ("The physical presence of other Christians is a source of incomparable joy and strength to the believer.").

John Robinson, Bishop of Woolwich in the Anglican Church, concludes that since the Christian church is to participate in the life of the world,

"[t]he function of worship is to make us more sensitive to these depths; to focus, sharpen and deepen our response to the world and to other people beyond the point of proximate concern (of liking, self-interest, limited commitment, etc.) to that of ultimate concern; to purify and correct our loves in the light of Christ's love; and in him to find the grace and power to be the reconciled and reconciling community." J. Robinson, Honest to God, 87–88 (1963).

Mohammed, founder of the Islamic faith, understood his role to be that of a messenger of God. The Koran, the scripture he brought to the Arab world, is God's message. Mohammed's reforms focused on renewed vigor in affirmation, worship and submissiveness to Allah; the word "islām" "denotes the quality of surrender to the Divine word" as recited in the Koran. K. Cragg, The House of Islam, 7, 101 (1969).

Islamic law is a symbol of God's involvement in the world, and the Koran teaches that the law is to be strictly obeyed as part of the community's worship and submissiveness to Allah. It commands participation in prayer, *Salāt*, one of the five pillars of *Din*, religious acts, required as the affirmation of the oneness and sovereignty of Allah. Professor Cragg of Cambridge writes of Muslim worship:

"All proceeds within a congregational unison in which the *imān*, or leader, does no more than occupy the space before the niche and set the time for the sequence of movements in which all participate. The essential sacrament, for such it is, is within each person's own privacy, requiring as it does the use of his own limbs and lips. Since all move in rhythm of posture and with identical words, the experience incorporates each individual into a communal whole." Id. at 57.

There are five prayer rites daily, and Mohammed required Muslims to pray communally whenever possible, particularly on Fridays at noon. The Koran,

Chapt. 62, p. 103 (N. J. Dawood trans. 1968) ("when the prayers are ended, disperse"); J. B. Christopher, The Islamic Tradition, 42 (1972).

Almsgiving, *Zakāt*, is another aspect of the *Din*. The Koran makes it mandatory that Muslims participate in sustaining their community, and the institution of almsgiving underlies Islam's attitude toward social responsibility. The Koran, *supra*, Chapt. 107, p. 28; Cragg, *supra*, at 47. A Muslim must aid the poor or victimized, and almsgiving is a metaphor for an obligation to be involved in the community and brotherhood of one's coreligionists. This aspect of the *Din* would require Islamic prisoners to seek and aid coreligionists; such communal activity is mandated by Islamic law.

The days of required fasting, *Ramadān*, another part of the *Din* prescribed by law, also have important communal aspects. Cragg states,

"[T]he 'withholding' of the body from its natural satisfactions from dawn till dusk reminds it, compellingly, of a Divine claim and imposes a pattern of discipline that educates and habituates it for other tasks and realms. The communal atmosphere the Ramadān provides powerfully reinforces the collective sense of Muslims, sets them a sort of sacramental sign of oneness, and affords, as experience confirms, an effectual way of becoming Muslim simply by making occasion for participant adherence." Id. at 67.

The need for this adherence is expressed in the word *Ummah*, which fuses notions of nation, people, community, faithfulness to Allah, and obedience to the Koran. *Id.* at 72. It is an expression of Muslim community that underlies all the required observances of the *Din*, and no Muslim community is successful without this understanding and achievement of *Ummah*.

It is apparent, even from this brief and superficial survey, that requiring prisoners to pray alone in their cells or to receive individual visits from mini-

sters when communal services are available constitutes a serious deprivation of the essence of religious freedom. Only the most urgent necessity could justify cutting plaintiffs off from the refreshment to the soul that they seek in religious services and from the benefit of the support that they give to and receive from coreligionists. No such necessity for violating the right to freely exercise religion has been shown in this case.

This is not to denigrate the role of individual prayer. *See, e. g.,* W. James, The Varieties of Religious Experience, 453–67 (Mod.Lib.Ed., 1902). It is only to say that the Constitution requires the broadest tolerance of religiously based activity and requires public officials to take care to avoid inhibiting any thoughts or deeds reasonably characterized as religious.

B. *Access to jailhouse legal assistance.* It is true, as defendants argue, that plaintiffs, as pretrial detainees, enjoy the assistance of formal legal counsel. But we take judicial notice of the fact that the criminal defense system, like the criminal justice system generally, is seriously overburdened. Several times weekly this court receives various *pro se* petitions from petitioners at the BHD who require the assistance of their more knowledgeable jailhouse brethren. There can be little doubt that jailhouse lawyers facilitate the exercise of this fundamental right. Therefore, plaintiffs must be afforded the opportunity to consult with jailhouse lawyers when such assistance is required. *See* Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L. Ed.2d 718 (1969).

As the Supreme Court noted in Johnson v. Avery,

"unless and until the State provides some reasonable alternative to assist inmates in the preparation of petitions for postconviction relief, it may not validly enforce a regulation such as that here in issue, barring inmates from furnishing such assistance to other prisoners." 393 U.S. at 490, 89 S.Ct. at 751, 21 L.Ed.2d 724.

*See also* Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). *Cf.* Albany Welfare Rights Organization v. Wyman, 493 F.2d 1319, (1974); L. Brickman, Of Arterial Passageways Through the Legal Process: The Right of Universal Access to Courts and Lawyering Services, 48 N.Y.U.L. Rev. 595, 665–68 (1973).

The inconvenience to the BHD in permitting a jailhouse paralawyer to visit an inmate in administrative segregation seems minimal. *Cf.* Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed. 2d 600 (1969). If another program such as those described in *Johnson,* including law students, is made available to assist these prisoners in the preparation of writs and other papers, access to inmate legal advisers will not be necessary. Johnson v. Avery, 393 U.S. 483, 489–490, 89 S.Ct. 747, 751, 21 L.Ed.2d 718, 723–24 (1969); Sostre v. McGinnis, 442 F.2d 178, 201 (2d Cir. 1971), cert. denied sub nom. Sostre v. Oswald, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972); McDonnell v. Wolff, 483 F.2d 1059, 1065–1066 (8th Cir. 1973), cert. granted, 414 U.S. 1156, 94 S.Ct. 913, 39 L.Ed.2d 108 (1974).

C. *Access to educational and arts and crafts programs.* Educational and arts and crafts programs are of substantial psychological benefit to an individual in strict confinement. Conversely, the denial of access to such programs constitutes a substantial deprivation. The Warden must see to it that plaintiffs have essentially the same opportunity to participate in educational and arts and crafts programs as the general inmate population. He might wish to do this by organizing educational and similar programs on or near the tier where the plaintiffs are administratively segregated.

### III. OTHER CLAIMS

Plaintiffs claim that their confinement to administrative segregation violates their rights to the equal protection of the laws. Because there is no

"suspect classification" involved, *see, e.g.,* Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), and because the conditions of administrative segregation, once remedied as this court directs, do not appreciably burden the exercise of any fundamental constitutional right, *see* Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), the appropriate standard of review is that of rationality.

▮▮▮▮▮ Judicial review of differential treatment by the state under the rationality standard involves two related inquiries: (1) is the purpose of the differential treatment constitutionally permissible; and if it is, (2) can it rationally be said that the differential treatment is in fact related to that purpose. *See, e. g.,* Rinaldi v. Yeager, 384 U.S. 305, 309, 86 S.Ct. 1497, 1499–1500, 16 L.Ed.2d 577, 580 (1966) (impermissible to place cost of transcripts only on those incarcerated); McGowan v. Maryland, 366 U.S. 420, 425–426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393, 398–99 (1961) (blue sky law classifications valid).

In this case each of the purposes of administrative segregation is clearly constitutionally permissible. *See* General Orders No. 33, *supra,* section 4.48B. Whether facts exist, or probably exist, which justify subjecting these particular plaintiffs to administrative segregation is something to be determined, as noted above, in a manner consonant with due process. While that determination is being made, this court may not presume that the Warden or the Board of Corrections, as agents of the state, have acted irrationally, arbitrarily, or capriciously —that is to say, with no basis in fact or contrary to the facts. *See* McGowan v. Maryland, 366 U.S. 420, 425–426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).

▮▮▮ Plaintiffs also claim that the conditions of their confinement constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. The evidence belies this claim. *See* Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958).

Nonetheless, on other constitutional grounds we are directing that certain of the conditions of administrative segregation be remedied.

The court acknowledges that it reluctantly intervenes in the administration of this correctional facility.

"The task is a delicate one for courts because of the sensitive and precarious nature of correctional institutions. Prison officials, facing complicated and combustible situations each day, must be free to make a wide range of decisions. Much must be left to their good faith discretion. Sawyer v. Sigler, 445 F.2d 818 (8th Cir. 1971); Marnin v. Pinto, 463 F.2d 583 (3d Cir. 1972). Time has proved, however, that blind deference to correctional officials does no real service to them. Judicial concern with procedural regularity has a direct bearing upon the maintenance of institutional order; the orderly care with which decisions are made by the prison authority is intimately related to the level of respect with which prisoners regard that authority. There is nothing more corrosive to the fabric of a public institution such as a prison than a feeling among those whom it contains that they are being treated unfairly." Palmigiano v. Baxter, 487 F.2d 1280, 1283 (1st Cir. 1973).

*See* Morrissey v. Brewer, 408 U.S. 471, 484, 92 S.Ct. 2593, 2602, 33 L.Ed.2d 484, 496 (1972) ("fair treatment . . . will enhance the chance of rehabilitation by avoiding reactions to arbitrariness").

Intervention is likely to inconvenience the administration of the BHD. But the Constitution and its Amendments were not proposed and ratified in the interest of administrative convenience. Public officials and administrators, no less than the courts, bear a heavy responsibility to heed and apply the letter and spirit of the Constitution as they carry out their important tasks. Because public officials bear a primary responsibility for defining, on a practical, day-to-day basis, the character and quality of our social

life, their constitutional obligations are particularly heavy. But it is a weight that must be borne. Considering the benefit our society derives from a strict adherence to our constitutional tradition, the price we pay is minimal. As we were recently reminded in Palmigiano v. Baxter, 487 F.2d 1280, 1287 (1st Cir. 1973):

> "We are fully sensitive to the fact that public administrators may view court decisions affecting 'lesser' rights as intrusions into their own realm, and as setting the outer limits of constitutional accommodation. Two observations can help place this area of adjudication in perspective. The first is that the 'realm' is that of the Constitution, and that the Constitution is, in the first instance, addressed to government and its officials; this is the premise, not the consequence, of judicial review. The second is that a court decision can most constructively be taken as not only prescribing, as a minimum, a specific rule arising out of a particular case, but as a helpful guide in suggesting the direction in which administrators may soundly proceed with their more detailed implementation."

## IV. PRELIMINARY INJUNCTION

█ In determining a plaintiff's right to a preliminary injunction, the court must consider the degree of likelihood of ultimate success on the merits, and the relative hardships to both parties. *See, e. g.,* Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969).

█ The facts, developed at a week of hearings held both in court and at the BHD—so extensive that they constitute the basis for a final determination—show that ultimate success on the merits by plaintiffs is likely in certain respects. The irremedial hardship to plaintiffs of segregation and the lack of access to religious services, jailhouse legal assistance, and educational and arts and crafts programs is evident.

Defendants are directed to permit plaintiffs, pending final determination of the action:

(1) to participate in religious services and to observe religious holidays with the general inmate population;

(2) to consult with jailhouse para-lawyers unless other equivalent assistance is provided; and

(3) to participate in educational and arts and crafts programs available to other inmates.

So ordered.