**Ronald E. TERMUNDE, Plaintiff,**

v.

**Gerald L. COOK, et al., Defendants.**

**No. 86–C–0082S.**

United States District Court,
D. Utah, C.D.

April 21, 1988.

256

Stephen R. Cook, Mooney & Smith, Salt Lake City, Utah, for plaintiff.

David L. Wilkinson, Atty. Gen., Stuart W. Hinckley, Asst. Atty. Gen., Chief, Human Resources Div., Brent A. Burnett, Asst. Atty. Gen., Salt Lake City, Utah, for defendants.

## RULING

SAM, District Judge.

This action is before the court on plaintiff Ronald Termunde's objection to the Magistrate's report and recommendation that Termunde be denied injunctive relief because Utah State Prison (USP) officials acted reasonably by refusing Termunde access to religious services. The Magistrate could find no supporting authority for enjoining USP officials from restricting inmate attendance at religious services; however, he recommended Termunde's proposal for allowance of some services should be considered and tried on an experimental basis.

Termunde objects to one of the Magistrate's reasons for denying injunctive relief, that is, the present suit is not a class action. Termunde argues that fact should be irrelevant, because he should be entitled to relief regardless of the number of inmates joined in this action.

The court notes the class action rationale is not the sole basis for the Magistrate's decision. The Magistrate also cites extensive case law supporting the prison officials' right to assess the security requirements of their facility, and tailor their pro-

grams and policies to meet those requirements. That rationale is sufficient to support denial of Termunde's request for injunctive relief.

For reasons set out fully in the Magistrate's thorough and well-considered opinion, the court adopts the opinion in its entirety, and denies Termunde's request for injunctive relief.

## REPORT AND RECOMMENDATION

### February 22, 1988

RONALD N. BOYCE, United States Magistrate.

The plaintiff, Ronald Eugene Termunde, an inmate at the Utah State Prison (U.S.P.), housed in protective custody segregation on "A West", a special administrative segregation unit in Unit II, U.S.P., filed suit under 42 U.S.C. § 1983 against the warden of Unit II, U.S.P., and Robert Steele, program director of the medium security Unit II, U.S.P., complaining of a denial of group religious services, inadequate recreational activities and lack of educational programs for inmates confined on "A West." An answer was filed denying any violation of plaintiff's civil rights. Mr. Stephen R. Cook, Esq., was appointed to represent plaintiff.[1]

An amended complaint was filed naming as an additional defendant Fred Van Der Veur.[2] The amended complaint stated that the alleged wrongful conduct of the defendants was in violation of the First and Eighth Amendments. The plaintiff sought injunctive relief and damages in the sum of $50,000.00. Hearing was held before the magistrate under 28 U.S.C. § 636(b)(1)(B). This report and recommendation is submitted pursuant to the reference.

The plaintiff testified that he was received at the U.S.P. in 1984. He was first confined in the orientation section, but was thereafter transferred to other blocks in medium security. Finally, for his own protection, the plaintiff was confined in the protective custody unit of "A West." "A West" is actually an administrative segregation unit encompassing a number of inmate classifications when the inmate is in need of special segregation for one reason or another.[3] The plaintiff has been imprisoned for a crime against a child and is therefore a high risk inmate for violence by other inmates.[4] Although the plaintiff testified he did not request protection, he does not seek release from protection custody, and the judgment to impose protective custody has not been challenged.

On "A Block", there are three to four officers on the block during each shift. The plaintiff is confined in his cell twenty-three hours a day and is let out of his cell for five hours a week, one hour each day. He may shower, use the telephone, go outside to a limited outdoor recreation area, and engage in recreational activities. A few balls are available as well as chess and card games. Use of weights has been prohibited because the weights and bar collars have been used as weapons. Originally, the block was locked-down and only three hours a week out of cell time was allowed. However, the conditions were relaxed and five hours a week out of cell time is now allowed.

Plaintiff is a practicing member of the L.D.S. faith. Group religious services are not available to men housed on "A Block." Plaintiff's Exhibit I is a religion survey conducted for this litigation that shows the religious preference and desire to attend services of the 89 inmates who were confined on "A Block" on January 13, 1987, and who responded to the survey. Thirty-two inmates are L.D.S. and others range from "satan" worshipers to Catholic,

---

1. The magistrate wishes to express sincere appreciation for Mr. Cook's acceptance of the appointment and his earnest and dedicated efforts on behalf of the plaintiff.

2. The plaintiff's amended complaint has misspelled the name of defendant Van Der Veur.

3. Administrative segregation is often used to describe various classifications of inmates in need of special control of protection. See *Deane v. Dunbar*, 777 F.2d 871, 876 (2d Cir.1985).

4. Rule 201 F.R.E. The fact that crimes against children invoke intense hostility against such violators from other inmates is well known.

Protestant, Methodist or more traditional religions. Plaintiff has not been allowed to attend L.D.S. educational programs or seminars. However, various religious officials and teachers from various denominations are allowed on the cell block to consult and attend with inmates who wish such service. Plaintiff complains these are not adequate substitutes for group religious services.

No educational programs or vocational training is available to inmates in the unit.[5] Schooling or other programs were not available to plaintiff although there was evidence that cell study programs were available toward high school credit. Hardback books are not allowed on "A West" but soft cover or books that have the cover removed are available.

Deputy Warden Fredrick Van Der Veur, defendant and officer in charge of Unit II, U.S.P., where "A West" block is located, is a correctional official with eighteen years service at the U.S.P. He testified that he participated in the decision to make changes in the conditions of "A Block." "A West" was a protective custody unit and "A East" a disciplinary unit. "A West" had been a more open unit, but several dynamics required changes in 1985. A decision was made to exercise greater control over the unit for the protection of inmates and staff. Fights and assaults were commonplace in the unit and attempts to isolate offenders proved inadequate. It was difficult to tell who was actually in need of protective custody and who was not, such as an inmate simply using the block as an "oasis" away from other units.

There were difficult logistical problems in inmate control and strong arm assaults were frequent. Finally, there were problems with an inmate being "burned out." Fires and the throwing of debris at officers were common. A lockdown was imposed to gain control of the unit. The violence level at the time was said to be at 9.5 on a scale of 10. Four to six assaults occurred each week. After the lockdown and new controls, the violence dropped to a scale of one. Originally, three hours outside of cell time per week was allowed and, after a short time, that was expanded to five hours. Other allowances were granted after time. Inmates are allowed out of their cells, ten at a time. A cell study program was allowed through Jordan School District. No college programs are available. Some inmates from "A East" were mixed on the block. The unit was composed of inmates who could not function in the main population.[6] Ten inmates out of cell at a time was found to be managable. Inmates are classified so that conflicting inmates are not allowed to mix out of cell. More guards would not necessarily bring about any better result because, when the unit was open, inmates were often stabbed in front of correctional personnel.[7] Vocational education was terminated at the U.S.P. because it was not cost effective.

A restriction on group religious services was imposed because of the need to maintain security and the difficult logistical problem of transporting inmates in groups from control units to such services and maintaining protection for the inmates.[8]

5. Vocational education programs are not available at the U.S.P. except as related to other work activities.

6. In Engel and Rothman, *The Paradox of Prison Reform,* 7 Harv.Jnl.L. & Pub.Policy, 413 (1984), it is noted that today's prisoner faces a type of violence quite different from his predecessor. It is fear of "violence at the hands of their fellow prisoners." See *United States v. Bailey,* 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980). See *Ramos v. Lamm,* 639 F.2d 559 (10th Cir.1980) cert. denied 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981).

7. If guards are armed, there are problems with excessive force and weapons being taken by inmates. If guards are not armed, the inmate with a "shank," "pic" or homemade weapon cannot be easily overcome. The judgment of how to man a unit has to be based on the dynamics of each setting.

8. During the hearing, the magistrate pushed Warden Van Der Veur to admit he could take ten inmates himself to services without incident. However, he also indicated other staff could not. The magistrate in asking the question knew that Van Der Veur's personality and willingness to not be intimidated would make other inmates unwilling to risk anything directly. However, with other staff the dynamics are significantly different. Therefore, the testimony on this point illustrates the subjective element of the logistics assessment.

Inmate and staff safety could not be adequately guaranteed against other inmates who may be bent on harming "A West" inmates.[9] For this reason, the staff defendants made the judgment to limit group religious practices for inmates on "A West." Transportation to the U.S.P. gym is equally, if not more, dangerous.

A unit management team and classification team reviews the status of each inmate, and plaintiff, if he felt willing to face the general inmate population, could request release from the unit. Plaintiff has not done so.

■■■ The circumstances with respect to the lack of educational programs and other so-called "rehabilitative programs" do not raise issues of constitutional significance. It is permissible for a state to structure its correctional system for punishment purposes as long as the punishment does not violate the Eighth Amendment. What is rehabilitative is a matter of judgment and there is no accepted model of rehabilitation among correctional experts. See Di Julio, Jr., *Governing Prisons*, p. 180–184 (1987). Courts have not accepted the claim that an inmate has a constitutional right to any educational, or other programs, and there has never been a recognized constitutional right of rehabilitation for prisoners. *French v. Heyne*, 547 F.2d 994, 1002 (7th Cir.1976); *McCray v. Sullivan*, 413 F.2d 444 (S.D.Ala.1976); *Sellers v. Ciccone*, 530 F.2d 199 (8th Cir.1976); Rotman, *Do Criminal Offenders Have A Constitutional Right To Rehabilitation*, 77 *Jnl.Crim.L. & Crim.* 1023 (1987).[10] Such interests are not mandated by the Eighth Amendment, or protected liberty interests. See *Moody v. Daggett*, 429 U.S. 78, 88 note 9, 97 S.Ct. 274, 279 note 9, 50 L.Ed.2d 236 (1976). Consequently, plaintiff's case to the extent it is based on lack of educational or other programs must be dismissed.

Also, absolutely no evidence was introduced as to any wrongdoing or improper action of Robert Steele. There is no showing of any connection between him on any alleged condition complained of by plaintiff. As a consequence, neither damages nor injunctive relief is proper and against Steele and the complaint against him must be dismissed. *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

Plaintiff's complaint as to lack of recreational time and activity has support in the holdings of some cases. *Ruiz v. Estelle*, 679 F.2d 1115, 1149 (5th Cir.1982); *Franklin v. Oregon*, 662 F.2d 1337 (9th Cir.1981); *Preston v. Thompson*, 589 F.2d 300 (7th Cir.1978). See cases cited p. 20 of plaintiff's memorandum.[11] Often the recreational or exercise opportunities have been considered in light of an overall evaluation of prison conditions to determine whether, under the totality of the circumstances, the conditions violate the Eighth Amendment.

■■ In this case, the original restriction imposed on "A West" was to gain control over the unit. It was in the nature of an emergency lockdown and correctional officials may undertake restrictive conduct in order to meet an emergency. *Hoptowit v. Ray*, 682 F.2d 1237, 1258 (9th Cir.1982). Under such circumstances conditions may be imposed that might otherwise be prohibited. In this case, prior to the imposition of restrictions, "A West" was out of control. The life and limb of inmates and staff were in constant danger. Conditions were not safe. U.S.P. correctional personnel confronted with the problem took steps to correct the situation. The imposition of restrictions was a proper correctional judgment. See *Hayward v. Procunier*, 629

---

**9.** Some inmates on "A West" are inmates suspected of being "snitches" (providing information) and such individuals are especially subject to attack. See *Wojtczak v. Cuyler*, 480 F.Supp. 1288, at 1293–1295 (D.C.E.D.Pa.1979). Anderson, "The Price of Safety: 'I Can't Go Back There'," *Corrections Mag.*, 6, 7 (Aug. 1980).

**10.** What is rehabilitative and whether is works is a much debated issue. See Bartollas, *Correc-*

*tional Treatment: Theory and Practice*, pp. 20–41 (1985).

**11.** Most of the cases cited by plaintiff preceed the decision of the Supreme Court in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) recognizing the fact that, in assessing prison conditions and security, deference should be given to the judgment of correctional authorities.

F.2d 599 (9th Cir.1980) cert. denied 451 U.S. 937, 101 S.Ct. 2015, 68 L.Ed.2d 323 (1981). In Manvile and Boston, *Prisoners' Self-Help Litigation Manual,* Rev. 2d Ed. (1983), it is said;

> Thus, courts have generally upheld "lockdowns" and other emergency procedures involving major restrictions on religious activity, law library access, time limits on disciplinary proceedings, visiting, showers, exercise, laundry, routine medical services, programs, and sanitation.
>
> The courts generally will not second-guess prison officials' decision that an emergency exists unless the officials are shown to have acted in bad faith or on a pretext.

*Id.* p. 144–145.

As control was obtained, U.S.P. personnel experimented with alternative approaches reaching the current standards of one hour each day, five days per week, with recreational and shower opportunities for ten inmates at a time.

Recently, in *Bailey v. Shillinger,* 828 F.2d 651 (10th Cir.1987), the Court of Appeals was faced with a complaint as to inadequate recreational time at the Wyoming State Prison. The Court approved circumstances more restrictive than those in the present case:

> Plaintiff further contends that he has been denied exercise and fresh air while in segregation. There is substantial agreement among the cases in this area that some form of regular outdoor exercise is extremely important to the psychological and physical well being of inmates, and some courts have held a denial of fresh air and exercise to be cruel and unusual punishment under certain circumstances. See, e.g. *Ruiz v. Estelle,* 679 F.2d 1115, 1152 (5th Cir.1982); *Spain v. Procunier,* 600 F.2d 189, 199 (9th Cir. 1979). None, however, has ruled that such a denial is per se an Eighth Amendment violation. See *Caldwell v. Miller,* 790 F.2d 589, 600 (7th Cir.1986) ("The Eighth Amendment does not provide a fixed formula for determining whether the effect of particular conditions consti-

> tutes cruel and unusual punishment...."). Plaintiff admits that since he brought this suit, the prison officials have constructed an outdoor exercise facility which he is allowed to use for one hour per week. Although this amount of exposure to exercise and fresh air is still restrictive, we cannot say, without more, that it fails to satisfy the demands of the Eighth Amendment.

*Id.* p. 653.

Not all prisons or units within a prison are the same. Denial of recreational opportunity in one context may be justified where it cannot be justified in another. Prisons and prisoners are not fungible. They vary greatly and what applies in one institution or one cell block may be improper in another. Much depends on the dynamics of the situation. Courts should be hesitant to intrude into the area of correctional judgment where such matters are concerned. *Bell v. Wolfish,* supra. Courts have no special experience or expertise in making the needed assessments. Sometimes they have plunged headlong into "reform" and, in fact, have created a more dangerous situation. Marquadt and Crouch, *Judicial Reform and Prisoner Control: The Impact of Ruis v. Estell on a Texas Penitentiary,* 19 Law and Society Review 557 (1985); Ekland–Olsen, Barrick and Cohen, *Court Decisions as Field Experiments: Evidence From Ruiz v. Estelle,* (1986); Ekland–Olsen, *Crowding, Social Control, and Prison Violence: Evidence from the Post–Ruiz Years in Texas,* 20 Law and Society Review 389 (1986); "Inside America's Toughest Prison", *Newsweek,* October 6, 1986, p. 46; Jacobs, *Stateville,* pp. 102–113 (1977); D. Julio, supra, p. 212–231. In recent years there has been a significant increase in correctional professionalism. The old days and conditions that led to judicial intervention, although maybe not fully corrected, have changed significantly. Courts should not be blind to the environmental and institutional changes that have occurred in corrections over the past few decades. Di Julio, supra, p. 248. Of course, courts should not let the "buzz word" of security be an excuse for cruel and unusual punishment or unjusti-

fied limitation of constitutional rights. However, in this case the plaintiff has not shown any violation of the Eighth Amendment or that the restrictions imposed by defendants were unreasonable under the circumstances. *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).

█ The plaintiff's complaint of the denial of participation in group religious services raises a First Amendment challenge to the conditions of plaintiff's confinement. Inmates still retain rights to the free exercise of religion, subject to special correctional needs. *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). There is no question about the legitimacy of plaintiff's religious beliefs and the genuine interest in group services. The plaintiff has properly pointed to the importance of group services to many religions. See *Wilson v. Beame*, 380 F.Supp. 1232, 1239–1242 (D.C.E.D.N.Y.1974) cited pp. 9–15 pl. memorandum. It must be concluded that group religious experience is basic to an inmate's First Amendment rights, c.f. *Cooper v. Pate*, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964).

However, this court has previously held that group religious practices may be curtailed or prohibited for security reasons. *Shepherd v. Cook*, 87–C–408W (D.C.Utah 1987) [available on WESTLAW, 1987 WL 46754]; *Scott v. Johnson*, 85–C–938A (D.C. Utah 1986). Legitimate security interests have been recognized to predominate over individual interest on "A West" in other cases for the same reasons advanced by Deputy Warden Van Der Veur in this case. See *Gallahan v. Hollyfield*, 670 F.2d 1345, 1346 (4th Cir.1982).

Recently, in *O'Lone v. Estate of Shabazz*, —— U.S. ——, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), the Supreme Court held that group religious practices could be curtailed for legitimate penological considerations. The court held it proper to prevent Muslim inmates from attending special group services where legitimate penological considerations applied:

> We take this opportunity to reaffirm our refusal, even where claims are made under the First Amendment, to "substi-

tute our judgment on ... difficult and sensitive matters of institutional administration," *Block v. Rutherford*, 468 U.S. 576, 588, 104 S.Ct. 3227, 3233, 82 L.Ed.2d 438 (1984), for the determinations of those charged with the formidable task of running a prison. Here the District Court decided that the regulations alleged to infringe constitutional rights were reasonably related to legitimate penological objectives. We agree with the District Court, and it necessarily follows that the regulations in question do not offend the Free Exercise Clause of the First Amendment to the United States Constitution.

*Id.* 107 S.Ct. at p. 2407. See also *Turner v. Safley*, —— U.S. ——, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

█ The state does not bear the burden of showing the unavailability of or the alternatives. Alternatives are only relevant to the reasonableness of the action. *Id.* Security, staffing and administration problems are relevant. *Id.*

█ In this case, the defendants have shown legitimate security interests that dictated the curtailment of group services. In Robertson, *The Constitution in Protective Custody: An Analysis of the Rights of Protective Custody Inmates*, 56 Cincinnati L.Rev. 91, 131–132 (1987), it is observed:

> Whereas freedom to hold religious beliefs is absolute, freedom to practice religion in prison can be limited by security considerations. Fearful of the dangers presented by the commingling of offenders, courts have held that prison officials may prohibit protection inmates from attending congregate religious services held within the general prison population or within the protection unit itself.

(Citing cases.)

This was recently approved in essence in *O'Lone v. Shabazz*, supra, and more directly in *Caldwell v. Miller*, 790 F.2d 589 (7th Cir.1986).

In the instant situation, the denial of group services has become a fixed policy. The evidence in this case does not justify

injunctive relief to change that policy. The magistrate believes the evidence of the need for a total ban on group religious services is close, but that defendants have prevailed in showing legitimate security concerns, including specific problems of transportation and equal treatment among inmates of all denominations, require such restrictions. Therefore, it must be concluded that there has been no violation of plaintiff's First Amendment right to free exercise of religion. Neither damages nor injunctive relief are appropriate at this time.

However, following the hearing in this matter, the magistrate asked each party to present a proposal for a limited reinstatement of group services in "A West." The proposal presented by the defendant's counsel was an itemization of the difficulties of such action, but also contains a "clearance" system proposal for screening inmates for such services. This proposal should be considered and tried on an experimental basis.[12] Plaintiff also notes group services could be tried in small groups. This could be evaluated through the screening proposal. High risk inmates could be excluded. Group services need not be held every week. Once a month at first would be a reasonable opportunity to test the feasibility of such a program.

At this time the magistrate believes that no program for group religious services should be ordered for plaintiff. The evidence does not show the circumstances require such relief. This is especially so since the instant action is not a class action. However, the same conditions that gave rise to justification for the restriction on "A Block" may have now passed. Violence is down, classification has improved. It is reasonable for correctional officers at the U.S.P. to undertake on an experimental basis a program that would accommodate group religious services for some inmates. If the experiment proves penologically unsupportable, it could be abandoned. If it appears reasonable, it should be continued. At this time, such an approach should not be ordered. However, the previous conditions justifying current restrictions will not necessarily provide a reason for such restrictions in all cases in the future. Dynamics of prison administration require respect for staff judgment. However, fossilized policy cannot be a rationale for contemporary restriction. If other suits are maintained, including another complaint by this plaintiff, which focuses more clearly on the facts that bear on the justification for curtailing group services, it may be that some form of affirmative relief would be justified. This would be a close issue in a class action suit. IT IS SO RECOMMENDED.

Copies of the foregoing report and recommendation are being mailed to the parties. They are hereby notified of their right to file objections hereto within 10 days from the receipt hereof.

---

**12.** It is not recommended that this be ordered.